UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

**RICKY BERNARD JONES**                                                                         **PLAINTIFF**

**v.**                                                                    **CIVIL ACTION NO. 4:23-CV-70-JHM**

**CORRECT-CARE SOLUTIONS** *et al.*                                                          **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendants' motions for summary judgment [DN 64, DN 67] and motion to dismiss [DN 94]. Fully briefed, these motions are ripe for decision.

**I.**

Plaintiff Ricky Bernard Jones was formerly incarcerated as a convicted prisoner at Kentucky State Penitentiary ("KSP"). Plaintiff brought this *pro se* 42 U.S.C. § 1983 prisoner civil-rights action asserting Eighth Amendment medical-care claims against State Defendants, Kentucky Department of Corrections Commissioner ("KDOC") Cookie Crews, KSP Warden Scott Jordan, and former KSP Warden DeEdra Hart; Wellpath Employee Defendants, APRN Karen Ramey and Kristi Ponzetti, and Defendant Wellpath. [DN 13].

In his verified complaint and amended complaints, Plaintiff alleges that he suffered injury to his shoulder on May 8, 2020, from a fight with another inmate, but that he "was not taken out for surgery for his shoulder until 12/06/22, his shoulder was nearly broken in two." Plaintiff claims that on the day of the incident, he was placed in KSP's segregation unit where he complained each day, for fifteen days, about his shoulder. [DN 13 at 5]. Plaintiff further alleges that both Defendants Hart and Jordan regularly made rounds inside of the segregation unit, knew he had sustained an injury, and needed to "be taken out of KSP for outside treatment." [*Id.*]. Plaintiff represents that he put in multiple sick-call slips and health services contact forms, but the medical

staff gave him either Tylenol or nothing at all, gave him heat rub, and advised him to do exercises and stretches. [*Id.* at 6]. Plaintiff asserts that when he put in a sick call slip, he would usually see Defendant Ramey, who worked under Defendant Ponzetti. [*Id.*].

Plaintiff contends that in May 2021 he received an x-ray of his left shoulder, but the results came back inconclusive. Plaintiff maintains that he was in severe pain and discomfort—nearly unable to lift his left arm half-way up in any direction and had difficulty doing daily tasks, showering, and getting dressed. [*Id.*]. Plaintiff further alleges that because of the increase of COVID-19 and multiple lockdowns, the grievance office was not open. [*Id.* at 7]. Plaintiff asserts that while other inmates were taken out of the prison for emergency medical runs, Defendants refused to authorize an outside medical trip for Plaintiff. [*Id.*; DN 85 at 5]. The record reflects that between May 14, 2020, to December 7, 2022, 189 KSP inmates left the facility for outside medical treatment for scheduled appointments, emergency room visits, and admissions to the hospital, some multiple times. [DN 96].

On initial review of the amended complaint, the Court allowed Plaintiff's Eighth Amendment claims for deliberate indifference to a serious medical need to proceed against Defendants regarding the alleged significant delay of medical treatment for the shoulder injury Plaintiff incurred.

**II.**

Before the Court may grant a motion for summary judgment, it must find that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of specifying the basis for its motion and identifying that portion of the record that demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party

satisfies this burden, the non-moving party thereafter must produce specific facts demonstrating a genuine issue of fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

Although the Court must review the evidence in the light most favorable to the non-moving party, the non-movant must do more than merely show that there is some "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, the Federal Rules of Civil Procedure require the non-moving party to present specific facts showing that a genuine factual issue exists by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute[.]" Fed. R. Civ. P. 56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

The fact that a plaintiff is *pro se* does not lessen his obligations under Rule 56. "The liberal treatment of pro se pleadings does not require the lenient treatment of substantive law, and the liberal standards that apply at the pleading stage do not apply after a case has progressed to the summary judgment stage." *Johnson v. Stewart*, No. 08-1521, 2010 WL 8738105, at *3 (6th Cir. May 5, 2010) (citations omitted). When opposing summary judgment, a party cannot rely on allegations or denials in unsworn filings, and a party's "status as a pro se litigant does not alter his duty on a summary judgment motion." *Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010). However, statements in a verified complaint that are based on personal knowledge may function as the equivalent of affidavit statements for purposes of summary judgment. *Weberg v. Franks*, 229 F.3d 514, 526 n.13 (6th Cir. 2000); *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992); 28 U.S.C. § 1746.

### III.

A review of Plaintiff's KSP's medical records is necessary to assess Plaintiff's claims.

The medical records reflect that on May 8, 2020, after a fight between Plaintiff and another inmate, Plaintiff was pepper sprayed, handcuffed, and then escorted to the segregation unit. Registered Nurse Jill Shirel checked the vital signs of Plaintiff approximately 45 minutes after the incident noting that his vital signs were normal and "there were no signs of injury." [DN 64-2 at 2]. The Nurse Treatment report prepared by Nurse Shirel dated May 8, 2020, reflects that "[i]nmate complains of left shoulder pain. no deformities felt. no bleeding, abrasions or bruising seen on inmate. no injuries to head. full range of motion to arms and legs. no injuries from restraints to ankles or wrists. OC was deployed on inmate. medical decontaminated him with one gallon of cold water." [DN 64-2 at 13].

On September 17, 2020, Nurse Heather Hernandez indicated that she observed Plaintiff "resting in cell [with] eyes closed[,] breathing with ease" during her rounds. [DN 64-3 at 30].[1] There are no medical records, including sick call slips between May 8, 2020, and March 31, 2021, regarding Plaintiff's shoulder injury.

On March 31, 2021, Plaintiff placed a healthcare request stating that he had a serious shoulder injury, and the record reflects that he was seen on April 3, 2021. [DN 64-5 at 30]. On May 11, 2021, Plaintiff placed another healthcare request asking to be seen by an outside professional due to the "serious damage" to his left shoulder causing pain and lack of sleep. [*Id.* at 31]. Nurse Hadley ordered a follow-up appointment with the provider noting that he had an x-ray scheduled for May 17, 2021. [*Id.*]. On May 11, 2021, Plaintiff filed an Inmate Grievance

---

[1] The parties agree that Plaintiff was not housed in the Restricted Housing Unit at the time of the rounds made by Hernandez. [DN 85 at 13–14].

4

Form complaining that he was injured in April of 2020, he was in severe pain, and he requested to be seen by an outside specialist who could surgically treat his injured left shoulder. [DN 104-10 at 2]. His grievance was rejected because it was filed more than five days after the incident. [*Id.* at 1].

On May 26, 2021, Nurse Practitioner Kim Jernigan saw Plaintiff at the KSP Clinic as a follow-up to review x-rays of his left shoulder. The record reflects that Plaintiff reported that he began having pain and decreased ROM after an altercation a year ago. [DN 64-3 at 12]. Jernigan noted that Plaintiff had left acute/chronic shoulder pain with a plan for shoulder injection. [*Id.* at 14]. Jernigan instructed Plaintiff to continue taking acetaminophen from the canteen, suggested Plaintiff undergo an "intraarticular steroid injection," and scheduled a follow-up in one week for that injection. [*Id.* at 15].

On July 19, 2021, Plaintiff saw Defendant Nurse Practitioner Karen Ramey for a general well-visit exam with no mention of his left shoulder in the record. [DN 64-3 at 16–21].

On August 9, 2021, Plaintiff saw Nurse Nancy Hadley for a sick call indicating that he needed help with arthritis. [DN 64-3 at 22]. The medical record reflects that Plaintiff requested capsaicin cream for his neck and shoulder. Plaintiff indicated that he has an allergy to ibuprofen and did not want to get started on steroid shots. [*Id.* at 23]. Hadley responded that she would check with the provider to see if she could obtain the cream for Plaintiff and placed the order for it. [*Id.*]. Defendant Ramey reviewed the medical notes. [*Id.* at 25].

On September 7, 2021, Plaintiff was again seen by Hadley for a sick call request: "My rotary/rotatory/rotator cup/cuff . . . is severely damages and causing me extreme pain/discomfort day and night in my left shoulder. I can't lift my arm hardly." [DN 64-3 at 26; DN 64-5 at 32]. Hadley noted that Plaintiff had been prescribed Diclofenac gel, used it for seven to 10 days, and

indicated that it did not help his pain, but made it worse. Plaintiff requested to be scheduled for surgery to have it repaired. [DN 64-3 at 27]. Hadley examined Plaintiff and noted "no obvious deformity, no swelling, does have some popping/grinding sounds/sensations in the left shoulder when he moves his arm back and forth or out to his side." [*Id.*]. Hadley further noted that Plaintiff's shoulder "[d]oes not seem to cause much pain with this aggressive movement." [*Id.* at 28]. Hadley ordered Plaintiff to continue with Tylenol and to continue passive range of motion ("ROM") exercises and indicated that she would send a message to the provider for further orders for treatment. [*Id.* at 29]. Upon review of the medical notes, Defendant Ramey noted that the x-ray of Plaintiff's shoulder showed modest degenerative joint disease and that they "can consider steroid joint injection if pt agreeable." [*Id.*].

On September 21, 2021, Plaintiff was seen by Defendant Ramey for a sick call request for his left shoulder pain where he stated that his shoulder was "broke." In his sick call request, Plaintiff noted that the pain started around April 2020 after being in an altercation, he reported limited ROM, "cracking, popping," sharp pain, hurts to put on a shirt, and pain in shoulder wakes him at night. [DN 64-3 at 34]. Upon examination, Defendant Ramey noted that there was "no significant muscle atrophy noted between left and right shoulders," "bony prominence noted on the top of the left shoulder," "significant crepitus with PROM," and "nontender to palpation." [*Id.*]. Under the assessment section of the medical record, Defendant Ramey notes that Plaintiff's x-ray results processed on May 20, 2021, indicated as follows:

> SHOULDER COMPLETE, MIN 2V, LEFT FINDINGS: The glenohumeral joint is in alignment, but there is narrowing of the joint space due to modest degenerative changes. Acromioclavicular and coracoclavicular joints are also normal. No shoulder fracture, separation, or dislocation is seen. CONCLUSION: Modest degenerative joint disease of the left shoulder; otherwise, no fracture or dislocation seen.

[*Id.* at 36]. Upon considering the x-ray results, Defendant Ramey educated Plaintiff on ROM/strengthening exercises and discussed steroid joint injections with a follow-up scheduled for a week. [*Id.* at 37]. Plaintiff was diagnosed with primary osteoarthritis of his left shoulder.

On October 5, 2021, Plaintiff was seen at the clinic by Defendant Ramey for a steroid joint injection of his left shoulder. [DN 64-3 at 44].

On October 26, 2021, Plaintiff was seen by Nurse Hadley for a sick call relating to his severe left shoulder pain, as well as a change of blood pressure medicine. [DN 64-3 at 49; DN 64-5 at 34]. At the sick call, Plaintiff requested to have his family set up an appointment with an outside orthopedic doctor. [DN 64-3 at 50]. Plaintiff complained that he had been down to the clinic several times for his shoulder "and nothing is being done for it." [*Id.*]. Hadley told him that he would need to talk with the provider and referred him to the provider. [*Id.*].

On November 2, 2021, Plaintiff was seen by Defendant Ramey for a sick call noting that Plaintiff had presented complaining of ongoing left shoulder pain "that has been ongoing for the last 2 years." [DN 64-3 at 54]. Plaintiff indicated that "[t]he pain has gotten worse over the last few months." [*Id.*]. Defendant Ramey encouraged continued exercise, ROM exercises, and continued acetaminophen. [*Id.* at 57]. Defendant Ramey states "[w]ill discuss possible alternative treatments with Dr. D'Amico. May need to consider PT, additional imaging or ortho consult." [*Id.*].

On December 28, 2021, Plaintiff underwent an MRI of his left shoulder. [DN 104 at 21].

On December 30, 2021, Plaintiff saw Defendant Ramey for a follow-up to review his MRI results and formulate a treatment plan. Defendant Ramey informed Plaintiff that the MRI shows:

> several abnormalities, including injury to the superior glenoid labrum, arthritis of the AC joint with impingement syndrome of the supraspinatus tendon with tendonitis, surface tear of the infraspinatus tendon, joint effusion on the shoulder joint posteriorly, tear of the supraspinatus tendon at its attachment, through and

>through tear and some retraction of the supraspinatus tendon, injury to the anterior labrum of the shoulder.

[DN 64-3 at 78]. Defendant Ramey indicated that she would discuss the MRI results with Dr. D'Amico and anticipated an "ortho referral." [*Id.* at 79].

On January 1, 2022, Plaintiff was seen in the KSP clinic for medication adjustment and results from his shoulder MRI. [DN 64-3 at 3]. Upon examination of his left shoulder, Nurse Anna Murphy noted that he had "decreased ROM and crepitus noted." [*Id.* at 4]. Murphy instructed Plaintiff to use Icy Hot for shoulder pain and stated that she "[r]eviewed MRI results with patient and plan to refer to orthopedics." [*Id.* at 11]. Murphy further states that she "[d]iscussed the issues with COVID-19 and this will be pushed back until the number of cases declined. Patient verbalized understanding and was agreeable." [*Id.*].

On January 5, 2022, Plaintiff filed a health service staff contact form stating, "[p]lease don't forget to take me out for surgery this month for my shoulder." [DN 13-1]. On March 4, 2022, Defendant Ramey responded, "You have not been forgotten. We will be scheduling outside trips soon." [*Id.*].

On April 26, 2022, Plaintiff was seen by an orthopedic physician, Dr. Russell Peyton, for his left shoulder. After examination and review of the MRI, Dr. Peyton recommended "proceeding with a subacromial injection to see if this improves his symptoms and will initiate a home exercise program with follow-up in 4-6 weeks for recheck." [DN 64-3 at 88]. He further noted that if after six weeks, Plaintiff's symptoms "fail to improve[,] we will discuss proceeding with arthroscopy for rotator cuff repair versus reverse total shoulder." [*Id.*].

On August 19, 2022, Plaintiff was seen by an orthopedic surgeon, Dr. Frederick Robbe who recommended Plaintiff undergo a "left shoulder arthroscopy, subacromial decompression,

AC Joint resection, acromioplasty, bursectomy, and repair of a full thickness rotator cuff tear." [DN 64-3 at 86].

On September 27, 2022, Plaintiff was seen at the clinic by Defendant Ramey for a follow-up. At the time of the follow-up appointment, Plaintiff had been seen by Dr. Robbe who recommended surgery and recommended a physical therapy plan. [DN 64-3 at 39]. Plaintiff had been diagnosed by the doctor has having a "complete rotatr-cuff tear/ruptr of left shoulder." [*Id.* at 41]. Plaintiff agreed to move forward with surgery and the recommended physical therapy. [*Id.* at 42]. Plaintiff was told that he would have to be transferred to a facility that offers onsite/hands-on physical therapy. [*Id.*].

On November 9, 2022, Dr. Robbe scheduled Plaintiff's surgery for December 8, 2022. [DN 64-3 at 84–85]. On November 19, 2022, Dr. Anna D'Amico at the Green River Correctional Complex ("GRCC") entered Plaintiff's post-op pain medical orders. [*Id.* at 61–62]. Plaintiff underwent surgery on December 8, 2022. [*Id.* at 82]. And on that same day, Plaintiff's medical records reflect that he was transferred to the GRCC for medical reasons with a sling and mobilizer to his left arm and would be housed in the medical unit for therapy. [*Id.* at 68–69]. In conducting medical unit rounds on December 12, 2022, Nurse Practitioner Karmen Penrose spoke with Plaintiff who informed her that his pain was well-managed and that he had not taken anything for pain that day. [*Id.* at 71].

## IV.

In their motions for summary judgment, both the State and Wellpath Employee Defendants argue that they are entitled to judgment in their favor on the merits of Plaintiff's Eighth Amendment claims against them, because Plaintiff failed to exhaust his administrative remedies, and because Plaintiff's claims are barred by the statute of limitations. Because the Court is

deciding the motions on the merits, the Court does not address either exhaustion or the statute of limitations.

The Eighth Amendment prohibits prison officials from showing deliberate indifference to a convicted prisoner's serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A deliberate indifference claim "has objective and subjective components." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004). "The objective component requires the existence of a 'sufficiently serious' medical need." *Id*. (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "The subjective component requires an inmate to show that prison officials have 'a sufficiently culpable state of mind in denying medical care.'" *Id*. (quoting *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000)). For purposes of this Memorandum Opinion and Order, the Court will assume that Plaintiff's allegations satisfy the objective component of this standard. Thus, the Court need only analyze the second component herein.

As to the second, subjective component, "the plaintiff must show that each defendant acted with a mental state 'equivalent to criminal recklessness'" in response to the plaintiff's serious medical need. *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018) (quoting *Santiago v. Ringle*, 734 F.3d 585, 591 (6th Cir. 2013)). Such a "showing requires proof that each defendant subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk by failing to take reasonable measures to abate it." *Id*. (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (internal quotation marks omitted)). Differences in judgment between a prisoner and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to establish a deliberate indifference claim. *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017); *Briggs v. Westcomb*, 801 F. App'x 956, 959 (6th Cir. 2020); *Mitchell v. Hininger*, 553 F. App'x 602, 605 (2014). The

Sixth Circuit distinguishes "between cases where [there is] a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976).  Where "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *see also Rouster v. Saginaw Cnty.*, 749 F.3d 437, 448 (6th Cir. 2014).  "Where the claimant received treatment for his condition, . . . he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell*, 553 F. App'x at 605 (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)).

### A. State Defendants

In their motion for summary judgment, the State Defendants argue that they are entitled to judgment on this claim because they have presented evidence which shows that they did not know of Plaintiff's injuries until he filed the instant action, *see* [Crews Aff., DN 64-7 at 2; Jordan Aff., DN 64-8 at 2; Hart Aff., DN 64-9 at 2], and even if they did know of Plaintiff's injuries, they are entitled to rely on the medical judgments of KSP's medical staff, who were employed by Wellpath.[2]  Wellpath contracts with the Commonwealth of Kentucky to provide medical care for inmates housed in Kentucky Department of Corrections facilities.

---

[2] Defendant Crews attests that she did not know of Plaintiff's injury or his complaints about his medical care until she was told in early 2024 that he had named her in the lawsuit. [DN 64-7 at 2]. Defendant Jordan represents that he did not become Warden of KSP until about three months after Plaintiff says his shoulder was injured. [DN 64-8 at 2]. He testified that he did not know of Plaintiff's injury or his complaints about his medical care until he was told in early 2024 that he had been named as a Defendant in the lawsuit. [*Id.*]. Similarly, Defendant Hart states that she was the Warden at KSP from July 2018 to August 2020. [DN 64-9 at 1]. She further represents that she did not know of Plaintiff's injury or his complaints about his medical care until she was told in early 2024 that she had been named as a defendant in this case. [*Id.* at 2]. The State Defendants further aver that Wellpath's medical staff decide when, or if, an inmate needs to be seen by outside medical providers. [DN 64-7 at 2–3; DN 64-8 at 2; DN 64-9 at 2]. And that, as non-medical prison administrators, they do not make such clinical decisions. [*Id.*].

11

As to Defendants' first argument, Plaintiff represents that Crews, Hart, and Jordan personally knew him. Plaintiff further states that he has made "multiple verbal complaints to [Defendant Crews] about his shoulder injury" and that "Hart & Jordan would regularly walk KSP's yard and make regular rounds inside of 3 Cell House Segregation where Jones worked almost on a daily basis as [an] inmate legal aid." [DN 85 at 2–3]. Plaintiff contends that these Defendants "were fully aware of his constant shoulder injury" and "failed to instruct KSP Medical Wellpath employees to properly treat Jones's condition." [DN 103 at 35, 42]. Jones states that despite his complaints to the State Defendants regarding his shoulder injury, the State Defendants would tell him to fill out a sick call form or advise him to do whatever medical personnel tell him to do. [DN 85 at 8–9; DN 103 at 31, 35]. Specifically, Plaintiff alleges "they would brush it off by stating things like 'that's a medical issue that you need to get taken care of, or some other smart remark." [DN 103 at 35].

Accepting Plaintiff's representation that Crews, Hart, and Jordan were aware of his shoulder injury, instructed him to notify medical, and instructed him to comply with the suggested medical treatment, the Court nonetheless agrees with the State Defendants that they were entitled to rely on the medical judgment of the prison medical staff in treating Plaintiff. *In Mitchell v. Hininger*, the plaintiff complained to the assistant warden of his facility about a serious medical need and delays in his treatment. 553 F. App'x 602, 607 (6th Cir. Apr. 4, 2014). The plaintiff argued that the assistant warden should have intervened on the plaintiff's behalf. *Id*. However, the Sixth Circuit held that this evidence failed to establish an Eighth Amendment claim because "lay officials may generally rely on medical staff's medical judgments." *Id*. (citing *Spears v. Ruth*, 589 F.3d 249, 255 (6th Cir. 2009)). The court reasoned, "[The plaintiff] cannot show that [the assistant warden was] aware of [any] mistreatment. At most, [the assistant warden was] aware

12

that [the plaintiff] wanted more treatment than the medical staff was providing. Failure to act in such a situation does not deliberate indifference make." *Mitchell*, 553 F. App'x at 607–608. In this case as well, Plaintiff's evidence establishes that the State Defendants knew, based upon Plaintiff's report to them, that he was receiving some care for his shoulder, just not in the time and manner he believed was appropriate. Thus, the Court concludes that no reasonable jury could find that Plaintiff's evidence establishes that the State Defendants acted with deliberate indifference to his serious medical needs by failing to intervene in the medical care they knew Plaintiff was receiving from KSP's medical staff. *See also Winkler v. Madison Cnty.*, 893 F.3d 877, 895 (6th Cir. 2018) (holding that corrections officers do not act with deliberate indifference to a serious medical need when "they reasonably rely on the assessments made by the medical staff"); *Ronayne v. Ficano*, 173 F.3d 856 (6th Cir. 1999) (unpublished table decision) ("Supervisory officials are entitled to rely on medical judgments made by medical professionals responsible for prisoner care."); *Hamilton v. Pike Cnty., Ky.*, No. 11-99, 2013 U.S. Dist. LEXIS 18317, at *22 (E.D. Ky. Feb. 11, 2013) ("Non-medical prison officials, such as Jailer Scott, act reasonably when they rely on the judgment of the prison medical staff.").

Thus, the Court concludes that the State Defendants are entitled to judgment in their favor as a matter of law as to Plaintiff's clams against them.

### B. Wellpath Employee Defendants

In response to the Wellpath Employee Defendants' motion for summary judgment, Plaintiff essentially argues that the care from KSP medical staff, including Wellpath Employee Defendants Ramey and Ponzetti, was so "woefully inadequate as to amount to no treatment at all."[3]

---

[3] To the extent that Plaintiff wants the Court to find the individual Defendants liable for what happened to him because of their collective actions, and potentially the collective actions of other non-Defendant Wellpath employees, the Court cannot. The Court must analyze Plaintiff's claims against each Defendant individually. *See, e.g., Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010) ("Each defendant's liability must be assessed individually based on his own

13

Plaintiff contends that the KSP medical transport log demonstrates that for 19 months prior to his surgery, the KSP medical staff, who were all employed by Wellpath, "took out and scheduled various other inmates for treatment for many other reasons medically and many of those inmates' injuries were of the same nature or less emergent than Jones's torn rotator cuff." [DN 104 at 23]. Essentially, Plaintiff argues that the KSP medical staff, including Defendants Ramey and Ponzetti, failed to take him to an outside provider in a timely manner. [DN 104]. The Court must consider these arguments in light of the admonition above that where "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake*, 537 F.2d at 860 n.5; *Rouster*, 749 F.3d at 448.

1. **Defendant Ramey**

As discussed above, Plaintiff's medical records reveal that he was seen immediately following the May 8, 2020, incident where he complained of shoulder pain. A non-defendant registered nurse checked the vital signs of Plaintiff and indicated that upon examination, his vital signs were normal, she felt no deformities, Plaintiff had no bleeding, abrasions, or bruising, and Plaintiff had full range of motion in his arms. [DN 64-2 at 2, 13].

The record reflects that on March 31, 2021, Plaintiff complained of a shoulder injury and after two healthcare calls, Plaintiff's shoulder was x-rayed on May 17, 2021, which according to the radiologist showed degenerative joint disease causing the narrowing of joint space in his

---

actions."); *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 564 (6th Cir. 2011) ("We must analyze separately whether Heyne has stated a plausible constitutional violation by each individual defendant, and we cannot ascribe the acts of all Individual Defendants to each individual defendant."); *Lanman v. Hinson*, 529 F.3d 673, 684 (6th Cir. 2008) ("This Court has consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right.").

shoulder. Based on these findings, Plaintiff met with a non-defendant nurse practitioner who instructed Plaintiff to continue taking acetaminophen from the canteen and suggested Plaintiff undergo an "intraarticular steroid injection." [DN 64-3 at 12–15]. Plaintiff opted to pursue a conservative course of treatment, initially rejecting the administration of a steroid injection and instead requesting capsaicin cream in August 2021. [*Id.* at 23]. On September 7, 2021, Defendant Ramey reviewed the medical notes of the non-defendant medical providers noting that they "can consider steroid joint injection" if Plaintiff is agreeable. [DN 64-3 at 29].

On September 21, 2021, Defendant Ramey saw Plaintiff for a sick call request for left shoulder pain. She conducted a physical examination and noted that the x-ray results reflected osteoarthritis of his left shoulder and encouraged strengthening exercises and steroid joint injections. [*Id.* at 37]. Thus, after these two additional sick call appointments, Plaintiff agreed to accept the steroidal injections for his shoulder pain in October 2021. [DN 64-3 at 44]. After a November 2021 sick call appointment with Defendant Ramey, she talked with the doctor, and he scheduled an MRI. [DN at 57]. Plaintiff underwent an MRI of his left shoulder in December 2021 at which time he was diagnosed with tear of his rotator cuff, among other injuries. [DN 64-3 at 78]. In January 2022, an orthopedic referral was made by Defendant Ramey, and, in April 2022, Plaintiff was seen by an orthopedic doctor who recommended "subacromial injection" and a follow up in 4 to 6 weeks. [DN 64-3 at 88]. After six weeks, Plaintiff was referred by the orthopedic doctor to an orthopedic surgeon. Plaintiff was seen by that surgeon in August 2022 at which time, the surgeon recommended surgical repair. [DN 64-3 at 86]. In September 2022, in a follow-up appointment with Defendant Ramey, Plaintiff agreed to move forward with the surgery. [*Id.* at 42]. In November 2022, the surgeon scheduled Plaintiff's surgery for December 8, 2022, and Plaintiff underwent surgery on that date. [*Id.* at 82, 84–85].

Upon consideration, the Court concludes that the evidence shows that Defendant Ramey did not act with deliberate indifference to Plaintiff's injuries. Nothing in the record reflects that Defendant Ramey saw Plaintiff after the incident in question or had contact with Plaintiff or reviewed Plaintiff's medical sick call visits until July of 2021 at the earliest. After that time, she reviewed the radiology report for the x-ray, approved capsaicin cream and Diclofenac gel for Plaintiff, recommended steroid shots in his left shoulder, physically examined Plaintiff's shoulder, promoted strengthening exercises, administered a steroid injection, scheduled an MRI of Plaintiff's shoulder after approval from the doctor, discussed MRI results with him, and referred him to an orthopedic doctor who in turn referred him to a surgeon.

Upon the evidence presented, although Defendant Ramey did not send Plaintiff to an outside orthopedic surgeon immediately upon review of his record, the Court concludes that no reasonable jury could find that the treatment provided by Defendant Ramey was so "woefully inadequate as to amount to no treatment at all." *Mitchell*, 553 F. App'x at 605 (quoting *Alspaugh*, 643 F.3d at 169). Plaintiff's concerns amount to a disagreement with Defendant Ramey, other non-defendant medical staff, his x-ray radiologist, and his treating physicians on the accuracy of the x-ray, the timeliness of his MRI, follow-up visits with the specialists, and surgery. As discussed above, a patient's disagreement with the course of treatment, including a desire for more aggressive or prompt treatment, is not sufficient to support a constitutional claim. *See Jones v. Hiland*, No. 3:16CV-P127-JHM, 2016 WL 3659936, at *5 (W.D. Ky. July 1, 2016) (internal quotation marks omitted); *Gibson v. Matthews*, 926 F.2d 532, 536–37 (6th Cir. 1991) (negligence of medical personnel does not state a claim under § 1983 for deliberate indifference to medical needs); *Westlake*, 537 F.2d at 860 n.5 ("Where a prisoner has received some medical attention and

the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.").

In light of the evidence above, the Court concludes that no jury could conclude that Defendant Ramey acted with reckless disregard to Plaintiff's serious medical needs or that she provided treatment to Plaintiff that was so "woefully inadequate as to amount to no treatment at all." *Mitchell*, 553 F. App'x at 604 (quoting *Alspaugh*, 643 F.3d at 169). As such, summary judgment in favor of Defendant Ramey is proper.

### 2. Defendant Ponzetti

In his verified complaint and amended complaints, Plaintiff alleged that Defendant Ponzetti is liable for the actions of Defendant Ramey and other non-defendant medical providers, who were her subordinates, and for the delays in care of his shoulder.

As to Defendant Ponzetti's role as the presumptive supervisor, the doctrine of *respondeat superior*, or the right to control employees, does not apply in § 1983 actions to impute liability onto supervisors. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978); *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 80–81 (6th Cir. 1995); *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). "Because § 1983 liability cannot be imposed under a theory of *respondeat superior*, proof of personal involvement is required for a supervisor to incur personal liability." *Miller v. Calhoun Cnty.*, 408 F.3d 803, 817 n.3 (6th Cir. 2005). "At a minimum, a § 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate." *Bellamy*, 729 F.2d at 421. The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter v. Knight*, 532 F.3d 567, 576 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002); *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Plaintiff's

allegations against Defendant Ponzetti are based on her supervisory authority; he does not allege that she was personally involved in his care or treatment. Similarly, with respect to Plaintiff's allegations that he signed up to see "Dr. Ponzetti to no avail," [DN 104 at 9], the Court is unable to locate any records that show any personal involvement by Defendant Ponzetti in the care or treatment of Plaintiff's shoulder. As such, the Court concludes that no reasonable jury could find that Defendant Ponzetti acted with reckless disregard to Plaintiff's serious medical needs.

To the extent Plaintiff sues Defendant Ponzetti based on her handling of his health care grievances, prisoners do not possess a constitutional right to a prison grievance procedure. *See Walker v. Mich. Dep't of Corr.*, 128 F. App'x 441, 445 (6th Cir. 2005) (*per curiam*) ("All circuits to consider this issue have . . . found that there is no constitutionally protected due process right to unfettered access to prison grievance procedures."); *Argue v. Hofmeyer*, 80 F. App'x 427, 430 (6th Cir. 2003) ("there is no inherent constitutional right to an effective prison grievance procedure") (citing cases); *LaFlame v. Montgomery Cnty. Sheriff's Dep't*, 3 F. App'x 346, 348 (6th Cir. 2001) (holding that plaintiff's allegation that jail staff ignored the grievances he filed did not state a § 1983 claim "because there is no inherent constitutional right to an effective prison grievance procedure"). For this reason, the denial of a grievance or the failure to act based upon information contained in a grievance fails to state a claim under § 1983. *See also Rollins v. McCalister*, No. 5:23-CV-00125-JHM, 2024 WL 256942, at *2 (W.D. Ky. Jan. 23, 2024). Therefore, judgment as a matter of law is warranted on Plaintiff's allegations against Defendant Ponzetti based on her authority as the reviewer of his health care grievances.

### 3. Treatment of Other Inmates

Plaintiff asserts that while other inmates were taken out of the prison for emergency medical runs, Defendants refused to authorize an outside medical trip for Plaintiff. [DN 13;

18

DN 85 at 5; DN 103 at 33]. The record reflects that between May 14, 2020, to December 7, 2022, 189 KSP inmates left the facility for outside medical treatment for scheduled appointments, emergency room visits, and admissions to the hospital, some multiple times. [DN 96]. Of those inmates, Plaintiff left at least four times for "MRI shoulder pain" on December 28, 2021, "orthopedics shoulder recommendations" on April 26, 2022, "4-6 week re-evaluation by surgeon" on August 19, 2022, and "surgery for left shoulder arthroscopy" on December 8, 2022. [DN 96 at 10]. It would also appear that Plaintiff had a consultation for a colonoscopy on July 24, 2020, and the colonoscopy on November 16, 2020. [*Id.*]. These records belie Plaintiff's accusation that Defendants refused to authorize outside medical trips for him.

### C. Wellpath

As the record reflects, after Defendants filed their motion for summary judgment, Wellpath filed for bankruptcy in the United States Bankruptcy Court for the Southern District of Texas. [DN 77]. The Court takes judicial notice that the bankruptcy court confirmed Wellpath's First Amended Joint-Chapter 11 Plan of Reorganization, which discharged Plaintiff's claim against Wellpath in this action. *See In re Wellpath Holdings, Inc.*, No. 24-90533 (Bankr. S.D. Tex. May 1, 2025), ECF No. 2596. Defendant Wellpath now moves to dismiss all claims against it based on the discharge. [DN 94]. A liquidating trust has assumed Wellpath's liability for all general unsecured claims that arose before the petition date. [*Id.* at 4]. Because Plaintiff's claims against Wellpath in this action are discharged, Defendant Wellpath's motion to dismiss it from this action will be granted.

In addition to his response to Defendant Wellpath's motion to dismiss, Plaintiff filed a motion to participate in the liquidating trust's non-binding alternative dispute resolution process. [DN 106]. This motion must be filed in with the United States Bankruptcy Court for the Southern

District of Texas or the administrators of the liquidating trust. The motion is not appropriately filed in this Court and will be denied as moot.

V.

For the foregoing reasons, **IT IS ORDERED** that Defendants' motions for summary judgment [DN 64, DN 67] are **GRANTED**, and Defendant Wellpath's motion to dismiss [DN 94] is **GRANTED**. The Clerk of Court is **DIRECTED** to terminate Wellpath from the action. Plaintiff's motion to participate in the liquidating trust's non-binding alternative dispute resolution process [DN 106] is **DENIED as moot**. The Court will issue a separate Judgment consistent with the Opinion.

Date: September 3, 2025

Joseph H. McKinley Jr., Senior Judge
United States District Court

cc:     Plaintiff, *pro se*
        Counsel of Record
4414.014